*State of Maryland v. Michael O. Grafton*, No. 1218, Sept. Term 2021.  Opinion filed on June 29, 2022, by Berger, J.

SUPPRESSION  OF  EVIDENCE  -  DISCLOSURE  OF  EVIDENCE  BEFORE CONCLUSION  OF  TRIAL  -  DISCLOSURE  OF  EVIDENCE  IN  TIME  FOR EFFECTIVE USE AT TRIAL

The circuit court erred in dismissing a criminal case due to the State's disclosure of exculpatory evidence on the eve of trial when the circuit court did not know the complete nature of the evidence or whether there would be a delay in obtaining additional evidence. Disclosure of exculpatory evidence that is made prior to trial does not automatically mean that the State violated its obligation to disclose.  The relevant inquiry when evidence is disclosed before trial is whether the defendant is able to effectively use the exculpatory information.

Circuit Court for Baltimore County
Case No. 03-K-18-002989

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1218

September Term, 2021

_____

STATE OF MARYLAND

v.

MICHAEL O. GRAFTON

_____

Berger,
Ripken,
Wright, Alexander, Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed: June 29, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this appeal, the State of Maryland, appellant, challenges the dismissal of a criminal information filed against Michael O. Grafton, appellee.[1] On July 12, 2018, the State filed a criminal information against Grafton charging him with various theft crimes.[2] Trial was scheduled to begin in the Circuit Court for Baltimore County on September 28, 2021. On September 27, 2021, Grafton filed a motion to dismiss and a request for sanctions. A hearing was held the following day. At the conclusion of the hearing, the court granted the motion and dismissed the criminal information in its entirety. This timely appeal followed.

The sole issue presented for our consideration is whether the circuit court erred in dismissing the criminal information. For the reasons set forth below, we shall reverse the circuit court's order of dismissal and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The basic facts of this case are not in dispute. In a criminal information filed on July 12, 2018, the State charged Grafton with one count of theft scheme, specifically, a scheme to "steal U.S. Currency (money) property of" eleven named individuals "having a value of at least $10,000 but less than $100,000," and eleven counts of theft by deception of various amounts of money belonging to each of the same individuals with knowledge that each

---

[1] Pursuant to Section 12-302(c)(2) of the Courts and Judicial Proceedings Article of the Maryland Code, the State "may appeal from a final judgment granting a motion to dismiss or quashing or dismissing any indictment, information, presentment, or inquisition."

[2] Charges were initially filed in the District Court of Maryland for Baltimore County, Case No.: 4C00440710, on March 6, 2017. That case was nol prossed.

victim was a vulnerable adult.[3]  The State alleged that the thefts occurred between July 4, 2014 and November 30, 2018.

The State alleged that Grafton was employed by Mid-Atlantic Human Services Corporation ("Mid-Atlantic") as a residential program manager until he was terminated from his employment on November 30, 2016.  Grafton acknowledged that from 2013 to 2016, he was employed by Mid-Atlantic as a facility coordinator and that he was paid a salary to oversee day-to-day operations at three different group homes.  He worked in an "'on-call' capacity" and travelled to different group homes to address issues with residents as they arose.  The residents of the group homes were disabled adult men.  Each resident received Social Security Disability Income and income from Maryland's Developmental Disabilities Administration.  Mid-Atlantic acted as the representative payee for the residents.  Each resident's disability income was used to pay for rent, groceries, community outings, clothing, furniture, and other personal needs.

The State alleged that, as part of his job, Grafton managed personal use funds for the residents.  Each resident had personal use funds, akin to petty cash, that were kept in a

---

[3] At the September 28, 2021 hearing on Grafton's motion to dismiss, the State claimed that in Count 2 of the criminal information, Grafton was "also charged in reference to a theft of a computer, in reference to one of the victim[]s" in the case.  According to the prosecutor, Mid-Atlantic Human Services Corporation had a receipt for a computer that was purchased for a resident using that resident's personal use funds.  A witness for the State was expected to testify that Grafton took the computer and it was not seen again.  When the witness questioned Grafton about it, Grafton advised that he had taken the computer to Best Buy because it was not working.  The witness would testify that the computer was never "found again, and the company had to buy a replacement computer."  The issue of whether Count 2 included a charge for theft of a computer was not addressed by the trial court.

bank account. Once a month, Grafton filled out a form requesting to remove money from a resident's bank account. The amount requested was based on the amount of money the resident had used during the prior month. After receiving the cash, Grafton placed it in a secure location in the group home to cover that resident's personal expenses for things such as activities, food, and clothing. Grafton was responsible for documenting the use of the personal use funds and reconciling the expenses to receipts provided by him or a live-in caregiver. At the end of each month, Grafton prepared a spreadsheet showing the date the funds were used, the store name, a description of the purchase, and the amount of cash spent. He also provided receipts to support that information. Grafton was responsible for comparing the amount spent to the amount remaining for each resident. If an expense was not valid, Grafton was to report the issue to his supervisor. The State alleged that Grafton, or others aided and abetted by him, submitted receipts to cover up his removal of cash from residents' accounts for unauthorized purchases.

## A.    Grafton's Motion to Dismiss

On the day before trial was set to begin, Grafton, by his defense counsel, filed a motion to dismiss the criminal information or, in the alternative, for sanctions against witnesses from Mid-Atlantic. The defense argued that, under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and Maryland Rule 4-263[4], the State had failed "to disclose

---

[4] Maryland Rule 4-263 prescribes the discovery obligations of the defendant and the State. The Rule provides, in pertinent part, that the State's Attorney, without the necessity of a request, shall provide to the defense "[a]ll material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged[.]" Md. Rule 4-263(d)(5).

exculpatory information, including impeachment information and information not otherwise admissible at trial that may lead to the discovery of admissible evidence."

According to the defense, earlier on the day the motion to dismiss was filed, the prosecutor had disclosed that during the same time frame that Grafton's alleged thefts occurred, another former employee of Mid-Atlantic, Tara Buddenbohn, was caught stealing money from the accounts of some of the disabled residents, that the company confronted her, and that she confessed. At the time Buddenbohn embezzled funds, she was employed as the entitlement benefits coordinator, and was in charge of giving Grafton the residents' cash and reconciling the residents' personal use funds. Buddenbohn's name appeared on the cover page of Mid-Atlantic's Personal Use Funds Procedures Training Packet.

The prosecutor disclosed to defense counsel that criminal charges had been filed against Buddenbohn in Baltimore County and Harford County and she provided defense counsel with four case numbers and two police reports related to those criminal cases. In Baltimore County, a *nolle prosequi* was entered as to the charges, but the Harford County case proceeded and Buddenbohn pleaded guilty and was ordered to pay restitution.[5]

---

[5] The parties do not dispute the following information about the charges against Buddenbohn:

> According to the online Maryland Judiciary Case Search, Buddenbohn was charged in the Maryland District Court for Harford County on November 22, 2016 in Case No. 5R00108512, and on January 26, 2017, in Case No. 6R00107932. She demanded a jury trial in both cases on July 13, 2017, and they were forwarded to the Circuit Court for

4

In his motion to dismiss, Grafton alleged:

> The prosecutor indicated that she was not aware of the prosecution against Ms. Buddenbohn until witnesses from the company disclosed it to her this morning. She immediately contacted counsel realizing this information was exculpatory. Unfortunately, the prosecutor had no records from the company regarding the details of the embezzlement and was only able to pull up information from secured case search. She sent counsel an email with four case numbers and two police reports attached. Exhibit B. As of the filing of this motion, this was the only information available to Counsel regarding this exculpatory evidence.

The defense maintained that Mid-Atlantic had been "aware of this overlapping incident since first initiating charges against" Grafton and that no witness from the company "previously disclosed this information in response to defense subpoenas." On December 18, 2019, the circuit court had ordered Mid-Atlantic to produce tangible evidence before trial, including reconciliation records for the residents' accounts from 2014-2016, "including emails regarding reconciliation and records of accounts approved." In response, Mid-Atlantic produced records that the defense argued were incomplete. At

---

Harford County and docketed as Case Nos. 12-K-17-001052 and -1-54. On October 3, 2018, she pleaded guilty to one count of theft in each case.

The Maryland Judiciary Case Search website does not return any Baltimore County criminal cases for Buddenbohn, however, the publicly accessible case search through MDEC reveals that she was charged with several theft crimes in the District Court for Baltimore County (Essex) on November 7, 2016, in Case No. 2C00441100, and on January 24, 2017, in Case No. 4C00443440. The State entered a nolle prosequi as to each charge in both cases on March 16, 2017.

5

a September 13, 2021 motions hearing, the prosecutor "proffered that the records disclosed were only those records that the company thought there were problems with." The defense asserted that as of the date of the motion to dismiss, Mid-Atlantic had "failed to comply with the Court's order to disclose all reconciliation records pertaining to the disabled residents during the relevant time frame."

According to the defense, from the limited information available from the police reports provided, Buddenbohn "was caught stealing from at least one of the same residents who [was] named in the charges against Mr. Grafton." Further, as the entitlement benefits coordinator, Buddenbohn "would have been the person who approved the reconciliation reports each month, and redistributed client money pursuant to the approval." The defense argued that had the complete reconciliation records been produced, that information would have been revealed.

On September 14, 2021, defense counsel issued subpoenas for witnesses from Mid-Atlantic. The subpoenas were marked "as subpoenas duces tecum and included a list of materials previously requested." On Friday, September 24, 2021, counsel for Mid-Atlantic advised defense counsel that "he would not provide additional materials in response to the subpoena because the company did not have time to respond." In the week prior to Grafton's scheduled trial, the State "continued disclosing documents received from the company that would have been relevant in response to the prior defense motion for tangible evidence."

The defense asserted that throughout the discovery process, Mid-Atlantic "had full knowledge that there was a concurrent prosecution pertaining to theft from the same

6

disabled residents during the same time period," that Buddenbohn had confessed to the theft, and that she later pleaded guilty. The defense stated:

> It appears to the defense that the company deliberately redacted material that would have led to this being discovered sooner. Counsel had no reason to know of the concurrent prosecution of Ms. Buddenbohn. Her departure from the company was not explained to the staff, and based on the defense investigation, the defense was under the impression that Ms. Buddenbohn had left the company after deciding to become a stay at home mom.

The defense argued that although the prosecutor was personally unaware of the prosecution of Buddenbohn until the day before trial, that did not excuse the State's violation of Grafton's constitutional right to due process under the Fifth and Sixth Amendments to the United States Constitution, Articles 21 and 24 of the Maryland Declaration of Rights, Maryland Rule 4-263, *Brady*, and other state and federal cases. The defense maintained that knowledge of Buddenbohn's cases should be imputed to the prosecutor handling Grafton's case, including both the case in Baltimore County and the case in Harford County.

The defense argued that it did not have time to conduct its own investigation into the matters disclosed by the prosecutor. The defense further alleged:

> Defendant has waited three years to be brought to trial in this matter. The matter has been delayed due to the COVID 19 pandemic and during that time Mr. Grafton has been prejudiced by the pendency of these allegations which prevent him from working in his chosen profession. Mr. Grafton is opposed to further postponements in this matter and asks that the Court fashion sanctions for the failure of the company to comply with court orders to disclose information and the failure of the State to disclose relevant exculpatory information

7

regarding a concurrent prosecution relevant to the allegations in this case.

The defense requested that the court dismiss the case "for egregious discovery violations that have prejudiced the defendant and prevented him from adequately preparing for trial." It also requested that the court issue a show cause order to Mid-Atlantic's attorney for contempt in violation of the court's order granting the motion for tangible evidence, failure to comply with defense subpoenas, and failure to disclose in a timely manner the details of Buddenbohn's prosecution. In addition, the defense requested the court to limit the testimony of State's witnesses at trial.

## B.     Hearing on the Motion to Dismiss

A hearing on Grafton's motion to dismiss was held on September 28, 2021. The prosecutor reviewed the procedures for handling personal use funds and the roles played by Buddenbohn and Grafton. She advised the court that each individual resident of a group home could have no more than $2,000 in his account. All money in excess of that amount had to be returned to Mid-Atlantic's office in Vermont, "which housed all of the money." When Buddenbohn began maternity leave, another employee took over her job responsibilities. That person discovered that money Buddenbohn claimed had been sent back to Vermont and the amount "left in the account" were "not the same."

The prosecutor explained that Grafton's role differed from Buddenbohn's in that he filled out a form requesting money for a resident and took it to Buddenbohn, who would provide him with the cash. Grafton signed a form acknowledging receipt of the cash and then brought the money back to the group home where it was kept in a secure place.

8

Grafton sent Buddenbohn reconciliation sheets and receipts. Based on those procedures, it was the State's position that Buddenbohn did not receive any money from Grafton, that Grafton received money from her, and that both of them were stealing, but from different places and at different times.

The prosecutor advised the court that even though Buddenbohn, as part of her employment, cosigned forms with Grafton and managed "all of the personal use funds" for individuals in Maryland, she "was never gonna be a witness" for the State. In addition, not all of Buddenbohn's victims were alleged victims of Grafton, although the prosecutor acknowledged that there was at least one, and possibly two, victims that were identified in both cases. The prosecutor argued that the appropriate remedy for the failure to disclose the information about Buddenbohn "would be a postponement."

Defense counsel argued that Mid-Atlantic "acted in bad faith" and put the prosecutor in "a very unfortunate position[.]" She maintained that the prosecutor had a duty "to know what's going on with other prosecutors in her office[,]" and that the decision to enter a *nolle prosequi* in Buddenbohn's case in Baltimore County must have involved an understanding by a Baltimore County prosecutor that the case was going to proceed in Harford County. Defense counsel argued that that knowledge should be imputed to the prosecutor in Grafton's case.

In support of her contention that dismissal was the appropriate sanction, defense counsel argued:

> The fact Ms. [Buddenbohn's] name is essentially scrubbed from the information that's provided in Discovery that's provided through the State to me in Discovery and also

9

provided from the company until the day before trial when I'm learning there was a concurrent embezzlement investigation involving an employee who was higher up than Mr. Grafton whose job it was to give him cash, and this case is allegedly theft of that cash that she gave him is directly exculpatory. . . .

I have yet to see any real evidence of a theft on behalf of Mr. Grafton. Postponements that were requested prior to COVID, as the Court knows, were for the purposes of Discovery. . . .

The company is using civil litigation tactics to play games to avoid my subpoenas, to disobey Court orders, and to deliberately put the prosecutor in a very awkward position where on the eve of trial she is aware of a severe Brady violation in this case. Based on that, I think the only appropriate sanction would be dismissal.

Mr. Grafton has waited a long time for his day in trial. He's been patient for me while I've repeatedly sought Discovery in this case. Now I'm before the Court knowing that a person was prosecuted for stealing cash, and it's the person who was responsible for handing him cash every month, and she stole cash. It's during the same time frame, and there's an overlap in victims.

I am not gonna take the company's word for it that it's different, and I'm not gonna take the company's name for it that, oh, it was just Mr. [M.] and one other person. These proffers are not acceptable to the Defense at this late date, so we're asking that the Court dismiss the case.

Counsel for Mid-Atlantic challenged defense counsel's assertion that the company acted in bad faith with regard to document production. He denied that Mid-Atlantic initiated the criminal proceedings, stating that according to the company's "licensing regulations" it was required to file a police report when it found irregularities in its books. After the police report was filed, the State "decided to take it up on its own." He also denied that Mid-Atlantic scrubbed Buddenbohn from the documents. Mid-Atlantic's

10

counsel testified that the company provided documents as well as statements about what was being provided in response to January and February 2020 subpoenas. Included among the items provided in March 2020 was a document signed by Buddenbohn as Grafton's supervisor. He stated that the company did not hear from defense counsel in the eighteen months between March 3, 2020, the date the last response was provided, and the week prior to the hearing, when four witnesses from Mid-Atlantic were served with subpoenas and an additional document request. Mid-Atlantic's counsel denied that the company refused to produce the documents requested, but stated that they did not have enough time to do so prior to the start of the trial.

Mid-Atlantic's counsel also responded to the trial judge's inquiry about when Buddenbohn was fired from her position at Mid-Atlantic. Mid-Atlantic's counsel stated that she began maternity leave in July 2016, that the person who handled her job while she was out discovered that she had been taking funds, and that when she returned to work in September 2016, she "was immediately fired." According to Mid-Atlantic's counsel, Buddenbohn "handled the funds for all of the individuals," distributed the funds to the individuals' "teams," and sent excess funds to the corporate office in Vermont.

During the course of the hearing, the judge inquired about the State's allegation that Grafton had stolen a computer and how he "could be on notice that he's being accused of stealing a computer[.]" Defense counsel argued that the indictment "specifically says money as to each count" and "does not say laptop." The prosecutor pointed to the use of the words "U.S. Currency (money) property of" in the first count of the criminal information and argued that Grafton was accused of "stealing the money because he took

11

the laptop. He used the money to purchase the laptop, which he took from" a resident, Mr. G. In addition, the prosecutor argued that the theft of the computer was included in the statement of probable cause.

The State argued that a postponement was the proper remedy. The prosecutor suggested that she could take a couple of days to "try to pull everything together" and get Buddenbohn served with a subpoena. Thereafter, defense counsel and the court could determine what to do. She maintained that although the case had "been around" for a long time, the court should consider both Grafton and the victims, who would "be victimized again" if the case was dismissed. She asserted that the court and parties had time to "make it right" and "provide the information and put Mr. Grafton in a position where he has it and can proceed to trial."

Defense counsel opposed a postponement on the ground that "it should've been done a very long time ago." She argued that this was "a trial by ambush," that she had not received all of the information she had requested, and that she learned on the day before trial that an admitted thief, Buddenbohn, stole money in the same time frame as the charges against Grafton, that Buddenbohn took cash from Grafton, and that she managed cash "for the entire duration of the time frame relevant to" this case. According to defense counsel, the fact that Grafton's case was a bench trial did not suspend the obligation of the prosecutor to comply with *Brady* and did "not suspend the obligation of the company through [its] attorney to comply with the Court Order and provide . . . all records of reconciliation that we now know were managed and approved by an embezzler who was prosecuted in Harford County." Defense counsel noted, "I can't say I'd only just want

12

information relevant to [Buddenbohn] or that I – you know, like let's subpoena her, let's call her as a witness.  I like to talk to my witnesses in advance.  I like to know my case.  We don't proceed with trial by ambush because that's not due process of the law . . . ."  Defense counsel stated:

> It's put the State in a very bad position where the State has committed an egregious *Brady* violation by not disclosing to me that their office was aware of the prosecution of Ms. [Buddenbohn] and was likely aware she was gonna plead guilty in Harford County, and that's why the case did not proceed in Baltimore County.  That's been something they should've known at the outset of this prosecution given the time frame.

> \* \* \*

> I'm here today finally thinking that I'm ready to begin trial in this matter on behalf of my client . . . and instead we're here knowing that there is a deep well of additional records relevant to this case that are exculpatory that haven't been provided.  So we're just expected to let people explain that under oath and take their word for it, and it's not acceptable.  So, I'm asking that the Court dismiss this case.

Defense counsel also argued, in the alternative, that the court schedule a show cause hearing to determine exactly what additional records would be relevant to the reconciliation of the personal use funds and the theft perpetrated by Buddenbohn, as well as information about the computer which the defense argued was not covered by the criminal information.

## C.    The Circuit Court's Ruling

The court found that the State was "responsible for the *Brady* violations here[.]"  It noted that the case was "four years and seven months old," and held that "[t]his is a *Brady* violation.  I agree with the defense, I'm gonna dismiss this case."  The court commented

13

that it could not "imagine how the State could prove its case." The prosecutor responded that the court had not even heard opening statements and did not see all the documents the State intended to introduce in evidence. The court clarified that it was "dismissing based on the *Brady* violation[,]" and merely noting that there seemed "likely to be huge problems" with reasonable doubt. The court subsequently stated that "[t]his evidence coming up at this late date is, I believe, violative of the State's obligations under *Brady*." The court went on to comment on "the huge age on this case," stating, "I do think [Grafton's] speedy trial rights are being violated" and that "whatever this new information comes out, I don't know what that leads to or where we go with that Discovery."

The prosecutor argued that "usually the dismissal is appropriate for *Brady* violation when it occurs after the case has gone to trial. That's what a lot of these cases are about." She asserted that the violation here "could be remedied because it's pretrial. So the appropriate response would be a postponement." She argued that "[w]e can get it set pretty quickly, and then we would have a hearing as to whether there was a speedy trial violation." The court disagreed, stating "I think by the situation here and what has gone on here with the *Brady* violation we have here, I think dismissal is . . . the appropriate result, and that's what we're gonna do."

**DISCUSSION**

The State does not dispute that it was required to disclose to the defense the evidence pertaining to Buddenbohn.[6] Instead, it argues that the circuit court erred in finding that it had committed a *Brady* violation and dismissing the charges. The State maintains that *Brady* applies to the "suppression" of evidence which occurs when the State withholds material evidence and prevents a defendant from using it at trial. According to the State, that did not occur in this case because the evidence about Buddenbohn was disclosed prior to trial. Even if *Brady* was applicable to the instant case, the State argues that the court's analysis was flawed and that it erred in dismissing the case instead of taking a less drastic approach.

**A.     Standard of Review**

Generally, we review a trial court's decision on a motion to dismiss an indictment for an abuse of discretion. *Kimble v. State*, 242 Md. App. 73, 78 (2019) (citing *State v. Lee*, 178 Md. App. 478, 484 (2008)). Where the trial court's decision involves an interpretation and application of Maryland constitutional, statutory, or case law, we determine *de novo*, whether the trial court's conclusions are legally correct. *Id.* (quoting *Schisler v. State*, 394 Md. 519, 535 (2006)). We review *de novo* a trial court's determination

---

[6] In its appellate brief, the State expressly acknowledges that it "does not dispute that it was required to disclose to the defense the evidence pertaining to Buddenbohn." In this Opinion, we do not discuss the scope of the required disclosure or whether responsibility for the timing of the disclosure is attributable to the State, Mid-Atlantic, or both. Rather, we focus upon the appropriate course of action for the trial court when it was made aware that evidence about Buddenbohn was disclosed to the defense shortly before trial.

15

as to the existence *vel non* of a *Brady* violation, as it presents a constitutional issue. *Canales-Yanez v. State*, 472 Md. 132, 156 (2021) (citing *Ware v. State*, 348 Md. 19, 48 (1997)).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Under *Brady* both impeachment and exculpatory evidence must be disclosed as there is no distinction between the two. *Id.* at 87-88. *See also Giglio v. United States*, 405 U.S. 150, 153-54 (1972). The State must disclose material under *Brady* even in the absence of a specific request by a defendant. *United States v. Agurs*, 427 U.S. 97, 110-111 (1976); *Grandison v. State*, 390 Md. 412, 431 (2005).

A defendant contending that the State committed a *Brady* violation must establish that the State withheld evidence that was both favorable to the accused and material. *Williams v. State*, 416 Md. 670, 692 (2010); *Ware*, 348 Md. at 38. The Court of Appeals has explained:

> In order to establish that the State has violated his due process rights under *Brady v. Maryland*, [a defendant] must establish: "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense – either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness – and (3) that the suppressed evidence is material."

*Canales-Yanez*, 472 Md. at 158 (quoting *Ware*, 348 Md. at 38).

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ware*,

16

348 Md. at 46 (quotations and citations omitted).  Stated otherwise, had the evidence been known and used by the defense, then it "would truly have made a difference to the outcome of the case." *Adams v. State*, 165 Md. App. 352, 425 (2005).

## B.  Preservation

As a preliminary matter, Grafton contends that the State failed to raise below the issue of whether the evidence had been suppressed and, as a result, it was not preserved properly for our consideration. According to Grafton, the State "tacitly conceded that the evidence was suppressed under *Brady* and its only contention below concerned the appropriate remedy." We disagree.

Under Maryland Rule 8-131(a), we will not ordinarily decide a non-jurisdictional issue "unless it plainly appears by the record to have been raised in or decided by the trial court."  This rule "serves to prevent the unfairness that could arise when a party raises an issue for the first time on appeal, thus depriving the opposing party from admitting evidence relating to that issue at trial." *Wilkerson v. State*, 420 Md. 573, 597 (2011).

The hearing below was for the purpose of addressing Grafton's motion to dismiss for violations of both *Brady* and Md. Rule 4-263. The State acknowledged the untimely disclosure of evidence concerning Buddenbohn, but it never conceded that the evidence had been suppressed for the purpose of *Brady* or that there had been discovery violations. With regard to the asserted *Brady* violation, the prosecutor specifically argued that "usually the dismissal is appropriate for [a] *Brady* violation when it occurs after the case has gone to trial.  That's what a lot of these cases are about.  This could be remedied because it's pretrial.  So the appropriate response would be a postponement."  The prosecutor requested

17

a postponement of "a couple days" in order "to get all the information we possibly can together in reference to" Buddenbohn and provide it to the defense. The prosecutor also advised the court that she could "also get [Buddenbohn] served with a subpoena, we can get her in here. I believe she's still a Maryland resident as far as I know." The circuit court rejected the prosecutor's arguments, determined that a *Brady* violation had occurred, and dismissed the case. The issue presented was preserved properly for our consideration.

## C.    Suppression

The State does not dispute that it had an obligation to disclose evidence pertaining to Buddenbohn, but it argues that the circuit court erred in finding a *Brady* violation, and dismissing all of the charges, because Grafton failed to establish that the prosecutor suppressed or withheld evidence. According to the State, the circuit court's analysis was flawed because evidence is not suppressed or withheld -- and no *Brady* violation occurs -- when the prosecutor discloses the evidence prior to trial, even if the evidence is handed over on the eve of trial. The State further argues that the court erred in dismissing the case instead of imposing the less drastic remedy of a postponement.

Grafton counters that evidence pertaining to Buddenbohn had not been disclosed even on the morning of trial because documents had not been provided and the prosecutor had conceded at the hearing that she did not "exactly know what still exists." Grafton maintains that "[a]lerting the defense to a nondisclosure is not the same as making the disclosure." He argues that circumstances surrounding Buddenbohn's prosecution and related documentation, including plea agreements, disciplinary records, and statements made to law enforcement officers remained suppressed. According to Grafton, timeliness

18

for a *Brady* disclosure does not hinge on whether evidence is provided before or after trial, but rather whether it was provided in sufficient time for him to make effective use of it. Because the prosecutor acknowledged at the hearing that she did not know what evidence "still exists," Grafton argues that the disclosure was ineffective because it was not made in time for him to use it effectively in the preparation or presentation of his case.

The fact that the disclosure of information pertaining to Buddenbohn was made on the day before trial was set to begin does not, in itself, lead to the conclusion that *Brady* was violated. In *Adams v. State*, 165 Md. App. 352 (2005), we examined suppression in the context of a *Brady* violation. Judge Moylan, writing for this Court, examined the temporal aspect of suppression, which involves when the information at issue ultimately becomes known to a defendant, and noted that "[i]f the defendant learns of the information before the conclusion of the trial, to wit, in time to use it, there has been no *Brady* suppression." *Adams*, 165 Md. App. at 421-22. In reaching that conclusion, Judge Moylan pointed to our discussion of the timing issue in *DeLuca v. State*, 78 Md. App. 395 (1989), in which we wrote:

> There is the further problem of what is suppression and when does it occur. *Brady* and its progeny deal not, as here, with discovery sufficiently timely to enable the defense team to calibrate more finely its trial tactics but with the very different issue of withholding from the knowledge of the jury, right through the close of the trial, exculpatory evidence which, had the jury known of it, might well have produced a different verdict. Suppression contemplates the ultimate concealment of evidence from the jury, not the tactical surprise of opposing counsel. The *Brady* sin is hiding something and keeping it hidden, not hiding something temporarily in order to surprise someone with a sudden revelation. Even if the latter were just as sinful, it would be a different sin with a different name.

19

*DeLuca*, 78 Md. App. at 424.

In *Williams v. State*, 416 Md. 670 (2010), the State failed to disclose to the defendant prior to his first trial a witness's statement to a detective that she was legally blind. That information was disclosed to the defendant prior to his second trial. The Court of Appeals commented on the timing of the disclosure, stating:

> The cases are legion, however, that "[e]vidence *known to the defendant* or his counsel, that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*[.]" *State v. Rasmussen*, 225 Conn. 55, 621 A.2d 728, 747 (1993); *see also United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988) (stating that "[s]o long as a defendant is given impeachment material, even exculpatory impeachment material, in time for use at trial, we fail to see how the Constitution is violated."); *United States v. Vap*, 852 F.2d 1249, 1256 (10th Cir. 1988) (stating that "*Brady* is not violated when the *Brady* material is available to [a defendant] during trial."). Thus, *Brady* offers no relief when the defendant knew of the facts before trial. *Yearby v. State*, 414 Md. 708, 724, 997 A.2d 144, 153 (2010) (stating "[i]f the defendant has actual or constructive knowledge of the allegedly withheld exculpatory information, there cannot be a *Brady* violation.").

> * * *

> In order to establish a *Brady* violation, petitioner must prove that the State suppressed favorable evidence. Here, the videotapes were disclosed before the second trial, and hence, for purposes of this second trial, the evidence is considered not to have been suppressed, even though it should have been given to the petitioner earlier.

*Williams*, 416 Md. at 691-92 (some citations omitted).

Similarly, in *In re Matthew S.*, 199 Md. App. 436 (2011), in considering the late disclosure of an immunity agreement, we recognized that "*Brady* deals with the

20

suppression of evidence by the State, *i.e.*, withholding evidence through the close of trial."
*In re Matthew S.*, 199 Md. at 459.

In the instant case, the State disclosed some information about Buddenbohn on the day prior to trial but did not produce material it acknowledged could be obtained within a short time frame. Although that late disclosure no doubt amounted to a tactical surprise for the defense, the State's transgression did not, in and of itself, constitute "suppression" under *Brady*. Rather, the critical issue was whether Grafton could make effective use of the evidence pertaining to Buddenbohn. In *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527 (4th Cir. 1985), the Fourth Circuit Court of Appeals recognized that even assuming evidence is exculpatory, "its belated disclosure does not constitute reversible error. No due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *Id.* at 532 (citing *United States v. Higgs*, 713 F.2d 39 (3rd Cir. 1983)). The Court noted that "[w]hen determining the constitutional validity of a belated *Brady* disclosure, the relevant inquiry is solely whether the defendant was able to effectively use the exculpatory information." *Id.* at 532 n. 6 (citing *United States v. McCrary*, 699 F.2d 1308 (11th Cir. 1983)).

"Whether a delayed disclosure violates *Brady* depends on the nature of the evidence and the length of the delay, both of which affect the defendant's ability to make use of the evidence at trial." *United States v. Alvin*, 30 F.Supp.3d 323, 334-35 (E.D. Pa. 2014) (citing *United States v. Golyansky*, 291 F.3d 1245, 1248-50 (10th Cir. 2002) and *Leka v. Portuondo*, 257 F.3d 89, 100-01 (2001)). In *Miller v. United States,* 14 A.3d 1094, 1111 (D.C. 2011), the Court noted, "as we have repeatedly recognized, exculpatory evidence

21

must be disclosed in time for the defense to be able to use it effectively, not only in the presentation of its case, but also in its trial preparation." In *Miller*, the prosecutor failed to provide exculpatory grand jury testimony of a key witness until the evening before opening statements. *Id.* at 1097. In finding that the late disclosure was "not compatible with the Constitution," the Court noted:

> In the context of the present appeal, it is important to recognize that "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Leka* [*v. Portuondo*], 257 F.3d [89] at 100 [2001]. This is so, in part, because "new witnesses or developments tend to throw existing strategies and preparation into disarray." *Id.* at 101. The sequence of events in this case, like the record in *Leka*, "illustrates how difficult it can be to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices then available." *Id.* "The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing," and counsel may not be able, on such short notice, to assimilate the information into their case. *Id.* Further, "[t]he more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an 'opportunity for use,'" *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006), *i.e.*, "the opportunity for a responsible lawyer to use the information with some degree of forethought." *Leka*, 257 F.3d at 103.

*Id.* at 1111.

Grafton argues that dismissal "was the only appropriate remedy to address the prejudice caused by the State having suppressed exculpatory material for years[.]" That is not the case. *See e.g.*, *Williams*, 416 Md. at 693 n.8 ("Even had there been a *Brady* violation . . . dismissal of an indictment as a sanction is appropriate only where less drastic

22

alternatives are not available."). Here, the circuit court did not consider the less drastic alternative of a brief postponement before proceeding to dismiss the case.

It appears from the record that the trial was scheduled for two weeks. The information about Buddenbohn had so recently been disclosed to the prosecutor, that she did not know what additional information remained to be produced. In addition, the prosecutor expressed the State's willingness to assist the defense in obtaining in a short time frame records pertaining to Buddenbohn. Without knowledge of the nature of the evidence and the time in which it was ultimately produced by the State, the trial court could not determine whether Grafton could make effective use of it in preparation for or during trial. If the State was unable to produce the evidence in a short time frame, or if for some other reason Grafton ultimately could not make effective use of the evidence disclosed, then Grafton might have a claim that the delayed disclosure constituted a *Brady* violation.

In light of the specific circumstances of this case, however, the court could not, at the time of the hearing, determine that Grafton was unable to make effective use of the Buddenbohn evidence because only some material had been produced and the State did not know exactly what material "still remain[ed]" to be produced. For that reason, the circuit court erred in not imposing a less drastic alternative of a brief postponement to allow for the production of evidence by the State. We are not deciding whether dismissal is or is not an appropriate sanction for a *Brady* violation. The circuit court, however, needed to know the nature of the evidence and the length of delay before determining whether Grafton would be able to make effective use of it in preparation for trial or in the presentation of his case.

23

Moreover, disclosure under *Brady* is distinct from the State's discovery obligations under Md. Rule 4-263. The circuit court did not address the discovery violations asserted in Grafton's motion to dismiss. That issue may be addressed on remand. Because the circuit court did not determine whether a discovery violation occurred, we take no position as to whether a discovery violation did or did not occur. Nor shall we address what remedy, if any, would be appropriate. We are simply pointing out that the circuit court's dismissal was based solely on a *Brady* violation and the alleged discovery violations were not addressed. Further, defense counsel advised the court that had the case not been dismissed, she would have asserted Grafton's right to a speedy trial. Similarly, the defense is not precluded from raising that issue on remand.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE.**